## EASEMENT FOR A DRAIN.

Superior Court of Cincinnati.

LILIAN M. KEYLER v. IRENE C. EUSTIS.

Decided, January 20, 1913.

*Easements—Drain Carried Across an Adjoining Lot Belonging to the Same Owner—Both Lots Subsequently Pass to New Owners—Easement for Drains of Strict Necessity, and Easements by Implication.*

1. Where the owner of two lots of land, on which he has built houses drains one house by means of a private sewer which is laid through the other lot, and subsequently sells and conveys the house so drained, himself retaining the other lot, an easement is thereby created to continue the use of such private sewer, provided such easement is of a permanent nature, apparent, and beneficial to the premises so sold and conveyed.

2. In such case, where the use of the drain is not granted by the conveyance, but the premises are conveyed with all "appurtenances," "rights," or "privileges," the easement is created by implication.

3. But where, in such case the grantee is ignorant of the existence of the drain, and the same is not *apparent* on examination of the premises conveyed, no easement is created, except in case of *strict necessity*.

4. There can be no implied easement of drainage by *strict necessity*, where a privy-vault or cess-pool can be constructed on the premises which will take up the drainage even though the construction thereof will involve considerable expense and be less convenient than the drain, and may detract from the appearance and value of the property.

5. Where such an easement has been created by implication, and thereafter the grantor sells and conveys the servient tenement, and the conveyance does not mention the easement, and there is nothing in the appearance or condition of the premises to put the purchaser on inquiry, and the latter pays the purchase money and receives his conveyance without having knowledge of such easement, the easement is extinguished and he takes the property free of the same.

*Shattuck & Sawyer* and *Eugene Adler,* for plaintiff.
*Colon Schott,* contra.

PUGH, J.

The plaintiff, Mrs. Keyler, and the defendant, Mrs. Eustis, are owners of adjoining lots of land, located at the southeast corner of Michigan and Wabash avenues in the city of Cincinnati.

Michigan avenue runs north and south, and Wabash avenue intersects it at right angles. Mrs. Eustis owns the corner lot, which fronts fifty feet on Michigan avenue, and Mrs. Keyler owns the lot next east, which fronts fifty-five feet on Wabash avenue. There is a public sewer in Michigan avenue, but none in Wabash avenue, and a subterranean drain runs from Mrs. Keyler's house westwardly through the lot belonging to Mrs. Eustis and empties into the Michigan avenue sewer. Early in December last, the defendant, Mrs. Eustis, caused the drain to be broken through at a point on her own premises, and the ends cemented up so as to entirely shut off the drainage from the Keyler house.

This is an action for a mandatory injunction to compel the defendant to re-open the drain, and for damages.

The history of the drain, so far as it concerns this case, is as follows:

On or before September 20th, 1906, Mrs. Frances F. Diehl was the owner of a tract of land, which abutted one hundred feet on the east side of Michigan avenue and two hundred feet on the south side of Wabash avenue. This tract was divided into three lots, as follows:

A lot, beginning on the east side of Michigan Avenue, fifty feet south of the intersection with Wabash avenue, and running back eastwardly, one hundred and fifty feet, was improved by the erection of a house thereon, and sold to one Varian.

Later, a lot fronting fifty-five feet on the south side of Wabash avenue, beginning one hundred and forty-five feet east of the intersection of Michigan avenue, and running south one hundred feet, was improved by the construction of a residence thereon, and was sold and conveyed to Otto Luedeking, by deed dated September 20th, 1906. It should be stated that this lot for the first fifty feet of its depth is fifty-five feet wide, and the other

fifty feet of its depth only fifty feet wide.   For convenience, we
will call this the Keyler lot, as it now belongs to the plaintiff.

Still later, a house was built on the remaining lot and it was
sold and conveyed to Amanda J. Helman, by deed dated June
21st, 1907.   This lot we will call the Eustis lot, as the defendant
now owns it.   It fronts fifty feet on Michigan avenue, and runs
back eastwardly one hundred and forty-five feet to the Keyler
lot.   The diagram indicates the relation of the lots to each other.

Before any of the lots were sold, Mrs. Diehl had a subterra-
nean drain laid, which runs westwardly from the Keyler house,
crosses the east line of the Eustis lot, and, continuing on through
said lot, connects with the public sewer in Michigan avenue.
The houses on the three lots were all at one time connected with
this drain, but later, the drainage of the Varian house was
carried directly into the public sewer in the street, and its
connection with the drain entirely broken off.

When the drain was built does not certainly appear, nor is it
necessary in this case to ascertain.   It was laid before either the
Keyler lot or the Eustis lot was sold and while both were owned
by Mrs. Diehl.   It is not possible at present to locate the drain

itself with any precision, but it is agreed that it runs entirely through the Eustis lot. The defendant sys it runs beneath her house, and although this is denied, there are circumstances which go far toward supporting this claim.

The plaintiff is suffering and will continue to suffer hardship unless the drain is re-opened, as there exists at present no other way of draining her house. On the other hand the testimony shows that, before the drain was cut, there was an escape of sewer gas into the defendant's house, which threatened to render the lower part of it unhabitable, and that since the drainage from the Keyler premises has been shut off there has been no further trouble.

Whether the drain can be repaired so as to prevent sewer gas getting into Mrs. Eustis' house, or whether under present circumstances a larger pipe would be required, is not shown. Probably the later, as the quantity of drainage has increased since the drain was laid.

The plaintiff has offered to pay $100 to have the drain re-opened and for any necessary repairs. This she would probably have to do in any event, as ordinarily repairs necessary to the maintenance of an easement must be made by the owner of the dominant estate. *Bank* v. *Cunningham,* 46 O. S., 575, 588; *Lyon* v. *Fels,* 8 Ohio N. P., 450.

(1). As stated, on September 20th, 1906, Mrs. Diehl sold and conveyed the Keyler lot to Luedeking, but there was no mention in the deed of the drain nor anything therein from which its existence could be inferred. The conveyance, however, was of the premises, ''together with all the privileges and appurtenances to the same belonging.'' The testimony shows that Luedeking, the grantee, knew nothing of the existence of any drain, and, when he asked about the sewer and possible assessments therefor, was told it was all attended to and paid for.

When this conveyance was made the drain was in existence and the Keyler house connected therewith. It had not been in use, simply because the house had not yet been occupied. Mrs. Diehl retained ownership of the Eustis lot across which the drain was laid.

It is claimed for plaintiff that the effect of this conveyance was to establish an easement of drainage in favor of the Keyler lot and to impose a corresponding servitude on the property retained by the grantor.

When an owner of land has subjected one part of it to a permanent and apparent use for purposes of drainage, in favor of another part, which is reasonably necessary to the full enjoyment of the part so conveyed, and thereafter sells and conveys the part for the benefit of which such use was intended, himself retaining the other part, an easement to continue such use attaches to the part so conveyed, although the easement is not mentioned in the grant other than as an "appurtenance," "right" or "privilege." *Morgan* v. *Mason*, 20 Ohio St., 401; *Bank* v. *Cunningham*, 46 Ohio St., 575, 587; *Shield* v. *Titus*, 46 Ohio St., 528, 539; *Baker* v. *Rice*, 56 Ohio St., 463; *Weber* v. *Miller*, 9 Ohio C. C., 674; *Mesher* v. *Hibbs*, 1 Ohio C.C.(N.S.), 49; *Tiffany, Modern Law of Real Property*, Section 317.

An easement thus established is said to be created "by implication." The implication is that the grantor intended to convey and the grantee to acquire such easement. The rule is therefore said to be based on *intention*.

While both lots are owned by the same person, no such easement can exist, but such subjection of the one to the use of the other is called a *quasi*-easement which may thereafter ripen into an actual easement, if the property gets into the hands of a third person.

The *quasi*-easement in this case was of a *permanent* kind, and something quite different from a mere parol license, as claimed. Furthermore, when the use of the drain once began, it was *continuous* and of great convenience and benefit to the premises so conveyed.

It remains to enquire whether it was *apparent*. If it was so, there is no difficulty in inferring the grantor's intention to convey and the grantee's intention to acquire an easement of drainage.

But, where such *quasi*-easement is not mentioned in the conveyance, other than in such general terms as an "appurte-

nance," "right" or "privilege," and the grantee has no actual knowledge of it, and its existence is not apparent on examination of the premises, it is not easy to infer an intention to convey or acquire it. Indeed, the implication would seem to be the other way. The grantee, knowing nothing of such drain, it can hardly be said to have been an inducement to him to purchase the property at the price actually paid.

The rule, as above stated, will always therefore be found limited to cases where the alleged easement was either actually known to the grantee at the time he acquired the property, or where it was *apparent* on inspection of the premises or *visibly* dependent thereon.

Thus, the alleged easement must be "openly and plainly attached to or imposed on it" (the land), *Baker* v. *Rice*, 56 Ohio St., 475; or "visibly dependent," *Bank* v. *Cunningham*, 46 Ohio St., 575; or "apparent," *Mesher* v. *Hibbs*, 1 Ohio C. C., 49; or "obvious and apparent," *Bell* v. *Bell*, 7 Ohio N. P., 150.

In *Washburn on Easements* (4th Ed.), it is stated, p. 96, that the so-called easement must be "such as is indicated by the condition of the premises at the time of the grant."

In *Lampman* v. *Milks*, 21 N. Y., 505, a leading case on the subject, at page 507, the expression used is "open and visible."

In *Butterworth* v. *Crawford*, 46 N. Y., 349, also a leading case, it is said, page 352, no easement is thus created except "where the marks of the burden are open and visible," and, in the syllabus, the rule is thus stated:

"The rule of law which creates an easement in favor of one of two tenements or heritages belonging to a single owner, upon the sale of one of them, is confined to cases where there is an *apparent* sign of servitude on the part of the other, which would indicate its existence to a person reasonably familiar with the subject upon an inspection of the premises."

In *Tiffany, Modern Law of Real Property*, Section 317, the qualification is thus stated:

"That an easement to be thus created by implied grant, must be apparent is conceded by all the decisions, and it is apparent, it is said, for this purpose, if its existence is indicated by signs

which must necessarily be seen, or which may be seen or known on a careful inspection by a person ordinarily conversant with the subject. Accordingly, the question whether a drain or acqueduct which is underground or covered by buildings is apparent for the purpose of the rule depends, it seems, on whether there is any object in sight on the land purchased, such as a pump or sink which would indicate the presence of the acqueduct or drain.''

In *Hardy* v. *McCullough,* 23 Grattan, 259 (Va.), the rule is thus laid down:

''Whether the estate sold be the dominant or servient estate, it is well settled by numerous cases in England and in the states of the Union that the easement or other incident of property must be open, visible, apparent and continuous.''

In accord with the above, are decisions from many states: *Carbrey* v. *Willis,* 7 Allen, 364; *Tool Co.* v. *Engine Co.,* 9 R. I., 564; *Brown* v. *Fuller,* 165 Mich., 162; *Whiting* v. *Gaylord,* 66 Conn., 337; *Ellis* v. *Barrett,* 128 Ind., 118; *Carmen* v. *Boyd,* 73 Pa., 179; *Wells* v. *Garbutt,* 132 N. Y., 430; *Toothe* v. *Bryce,* 50 N. J. Eq., 589; *Janes* v. *Jenkins,* 34 Md., 1; *Cihak* v. *Klekr,* 117 Ill., 363; *Power Co.* v. *Veghte,* 21 N. J. Eq., 463; *Buss* v. *Dyer,* 125 Mass., 287; *Kelly* v. *Dunning,* 43 N. J. Eq., 62; *Scott* v. *Bentel,* 23 Grattan, 1; *Kenyon* v. *Nichols,* 1 R. I., 417; *2 Warvelle on Vendors,* Sections 533, 534.

The drain in this instance was entirely subterranean. Nothing short of excavation would reveal its existence. It was apparent, of course, that the Keyler house drained somewhere, but an examination of the premises was made by two successive purchasers, Luedeking and Mrs. Keyler, and neither of them found anything to suggest an underground drain. Mrs. Keyler inferred that the drainage was into a sewer in Wabash avenue, and Luedeking probably believed the same. There was so little reason to believe there was a drain that Mrs. Keyler, after living for some time in the house and being told about it by Mrs. Helman, her neighbor, refused to credit it. It was from six to eight feet below ground. No connection with it was visible on the premises. Mr. Diehl, who acted for his wife in the sales of

these lots, testified that he intended the permanent use of the drain to go with the Keyler house. Why, then, did he not say so in the conveyance, or, at least, inform Luedeking, his purchaser, of its existence? It was stated during the trial with much appearance of truth, that it might embarrass the sale of the Keyler house if it was known that it was not connected with a public sewer, and further that the drain, as constructed, was in violation of the rules· of the board of health, and so might become a source of trouble thereafter. Be that as it may, it is quite clear that if Diehl intended the purchaser to have the benefit of the drain, he did not intend to have it known that there was such a drain, until, at least, both lots were sold. As will presently appear the existence of the drain was not disclosed when the Eustis lot—the alleged servient tenement—was subsequently sold.

From Luedeking, the Keyler lot passed to the plaintiff by deed dated October 15th, 1907. This conveyance also failed to mention the drain, but contained the following clause, "This conveyance also includes all rights, appurtenant to and running with the premises hereby conveyed applying and running with the part of said lot No. Fifty-eight (58) formerly owned by Frances F. Diehl, said part being at the southeast corner of Wabash and Michigan avenues," and it is argued that this is a grant of the right of the drainage in question.

There are two answers, each conclusive, to this contention: First, as already seen, Luedeking, the plaintiff's grantor, had no easement of·drainage, though he may have believed he had. Under the decisions quoted, no easement was ever created. Second, this clause is a reference to a covenant contained in the conveyance from Mrs. Diehl to Luedeking, whereby the former binds herself, her heirs and assigns, not to erect or maintain any "stable or other structure in any way offensive or objectionable * * * upon said part of said lot No. 58 still owned by said Frances F. Diehl." When Mrs. Diehl subsequently conveyed such part of lot No. 58 to Amanda Helman, this same restriction appears again in the deed, but very much narrowed, thus: "It is agreed that no stable or barn shall ever be erected

upon the lot herein conveyed." The absence of any reference to the drain in either deed, viz., of the Keyler lot to Luedeking or of the Eustis lot to Mrs. Helman, the alleged and dominant tenements is very significant under the circumstances.

If Luedeking got no easement of drainage over the Eustis lot by the conveyance to him of the Keyler lot, obviously Mrs. Keyler could get no such easement by any conveyance from Luedeking, no matter what the conveyance contained on the subject.

(2). If, however, the *quasi*-easement of drainage, as it existed at the time of the conveyance of the Keyler lot to Luedeking, were one of *strict necessity,* and not merely one of greater or less convenience, comfort or expense, even in case of ignorance of its existence by Luedeking and in the absence of appearances or signs on the premises indicating its existence, where there is reason to believe that the grantor intended the use of the drain to become an easement appendant to the premises, I think the law would create it by implication, though I have found no well considered decision exactly in point.

The testimony shows that the use of this drain would be of great convenience and benefit to the property. It is not, however, an easement of *strict necessity.* A privy-vault or cess-pool, which will take up this drainage, could have been constructed upon the lot by Luedeking, and it can now be done as well by the plaintiff. It is true, this will put the plaintiff to some expense, and when built, it will not be as convenient or even as sanitary as a well constructed drain, it may detract from the appearance of the place, and, in some degree lessen the value of the property. But it will obviate the necessity of maintaining the drain, and where such vault or cess-pool can be so constructed, there can be no easement of *strict necessity.* *Brown* v. *Fuller,* 165 Mich., 162.

(3). Coming now to the consideration of the questions involved from the standpoint of the defendant:

After the conveyance of the Keyler premises to Luedeking on September 20th, 1906, Mrs. Diehl sold and conveyed the Eustis lot to Amanda J. Helman, June 21st, 1907. The deed imposed a restriction on the use of the premises for a stable or barn,

but contained no other restriction or reservation whatever.
There is no mention at all of the drain.

The law is well settled that an easement may be granted by
implication on property retained by a grantor when such ease-
ment is reasonably necessary or even of great convenience to a
full enjoyment of the estate conveyed, even though it be not
one of *strict necessity*.  *Baker* v. *Rice*, 56 Ohio St., 463; *Cave*
v. *Crafts*, 53 Cal., 135; *Kelly* v. *Dunning*, 43 N. J. Eq., 62;
*Cihak* v. *Klekr*, 117 Ill., 363.

But where it is claimed that an easement is reserved by im-
plication from a grant, even though the use of the part of the
land conveyed for the benefit of the part of the land retained or
not conveyed is well known to both parties, such easement must
be one of *strict necessity*.  It is in derogation of the grant and
nothing less than stringent need can overcome the rule that a
grantor can not derogate from his grant by implication.

The case of *Meredith* v. *Franks et al*, 56 Ohio St., 479, is ex-
actly in point.  Syllabus 2 is as follows:

"It is a general rule that one can not derogate from his grant;
so that to warrant the inference of a way reserved by implica-
tion, it must be one of strict necessity to the remaining lands of
the grantor; it is not merely a matter of convenience and if the
grantor has another mode of access to his land, however, incon-
venient, he can not claim a way by implication in the lands con-
veyed, though he may have been in the use of a way over it to
a public highway at and a long time before the conveyance, and
of which the grantee had notice at the time."

Without further quotation of authorities, the following are
cited as decisions to the same effect on the same point: *Brown* v.
*Fuller*, 165 Mich., 162; *Carey* v. *Rice*, 58 Cal., 159; *Collins* v.
*Prentice*, 15 Conn., 39; *Walker* v. *Clifford*, 128 Ala., 67; *Stevens*
v. *Orr*, 69 Maine, 323; *Burns* v. *Gallagher*, 62 Md., 462.

In all of the cases above cited the grantor had himself retained
the so-called dominant tenement, while, in the present instance,
he had already disposed of it by conveyance to Luedeking.
There is nothing, however, in this circumstance to prevent the
application of the rule.  If he had retained the Keyler lot, no

easement would have been reserved in his favor against a purchaser of the Eustis lot, except by *strict necessity*, and, since he has parted with it, the same rule should apply to anyone claiming through him.   Such easement is not appendant to the person but to the property.

Hence it is apparent that no servitude was imposed upon the Eustis property by implication arising from the sale and conveyance of the same by Mrs. Diehl to Mrs. Helman.

(4).   There is another consideration which likewise leads to the conclusion that the Eustis premises can not be subjected to this servitude of drainage.

When Mrs. Helman acquired the lot, June 21st, 1907, and paid the consideration and received a conveyance of the entire estate, with no reservation or restriction whatever (except as to the maintainance of a barn or stable) she had no notice, actual or constructive, of the concealed drain.   This makes her a *bona fide* purchaser, and, under the well established rule in equity, no prior claim of an interest in the property can be asserted against her.   Even if it is conceded that, while Mrs. Diehl remained owner of the Eustis lot, there existed an easement of drainage across it appendant to the Keyler premises, such easement was cut off and extinguished as soon as the servient tenement came into the hands of a *bona fide* purchase without notice.

As already stated, Mrs. Helman acquired the property without having been informed of the existence of the drain, and the fact, as it seems to be, that she afterwards learned of it is immaterial.   Her rights and obligations with respect to the premises were determined by the conditions existing at the time of the purchase.   There was no mention of the easement in the conveyance, nor anything in the condition of the premises to put her on enquiry.   The clause in the deed from Luedeking to Mrs. Keyler, hereinbefore quoted, even if construed as a reference to the drain in nowise affected her; it was not in the chain of title to the lot she bought, and the deed containing it was not executed until nearly four months after the conveyance to her of the Eustis lot.

As *bona fide* purchaser she took the property free of the alleged easement (*Treadwell* v. *Inslee,* 120 N. Y., 458, 465; *Gas Light*

*Co.* v. *Meyerhardt,* 61 Ga., 287; *Taggart* v. *Warner,* 83 Wis., 1; *McCann* v. *Day,* 57 Ill., 101; *1 Tiffany, Modern Law of Real Property,* Section 333). The rule as stated, is recognized in *Spicer* v. *Waters,* 65 Barb., 227, 231; *Baurman* v. *Griffiths,* 35 Neb., 361, 366; *Jewett* v. *Palmer,* 7 Johns Ch., 65, although its application was denied in these cases as the purchasers had parted with nothing of value.

Any other finding than this would require the court to say that a purchaser in good faith of land, who has examined ·the title of record and found it free and clear of any burden, and who has no knowledge of any claim against the property and finds nothing in the appearance of the premises to put him on enquiry, and who then buys the land and pays full value therefor, and receives a conveyance from the owner of record, containing no reservation or restrictions whatever, may none the less have the property subjected to a servitude which will materially diminish the value of the estate and impair its use for the purposes for which he bought it.

If Luedeking had enquired as to whether there was a public sewer on Wabash avenue whereon the Keyler lot fronted, and whether the house was connected with it, he would have learned that there was no such sewer and that the premises were dependent on a private drain laid across the adjoining lot. As this property was then the property of his grantor, he could have insisted on a definite conveyance to him of an easement of drainage by means of the existing drain, and such conveyance could have been recorded so as to be notice to anyone thereafter acquiring the servient tenement and thereby furnish him ample protection. It would have been no more than the exercise of the same degree of care which secured him from the erection of a barn or stable on the Eustis lot.

When Mrs. Keyler bought the lot, Luedeking, of course had no power to grant her any easement, and Mrs. Diehl no longer owned the Eustis lot. If, however, instead of assuming that the house drained into a sewer in Wabash avenue, she had ascertained the real state of affairs, as ordinary prudence required, she could have made some arrangement with Mrs. Helman, who

then owned the adjoining property, or, failing that, have declined to buy it.

From the foregoing it follows that the plaintiff is not entitled to the relief sought, and her petition will therefore be dismissed.